UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOY E. KING,                          )
                                      )
            Plaintiff,                )
                                      )
        vs.                           )        No. 4:07-CV-03 CEJ
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
            Defendant.                )


<u>MEMORANDUM AND ORDER</u>

This matter is before the Court for review of an adverse
ruling by the Social Security Administration.

I.    <u>Procedural History</u>

On April 5, 2004, plaintiff Joy E. King filed an application
for a period of disability, disability insurance, and supplemental
security income (SSI) benefits under Title II and Title XVI of the
Social Security Act, 42 U.S.C. §§ 401 <u>et seq.</u>, 1381 <u>et seq.</u>,
claiming that she had been unable to work since March 2, 2004.
Plaintiff alleged disability based on a hyperthyroid condition and
muscle damage to her back. (Tr. 57, 340, 341).[1] Plaintiff's

_____

[1] The ALJ's decision erroneously refers to "hypothyroidism."
(Tr. 12).
    Hyperthyroidism is defined as "abnormality of the thyroid
gland in which secretion of thyroid hormone is usually increased
and is no longer under regulatory control of the hypothalmic-
pituitary centers." <u>PDR Med. Dict.</u> 856 (2d ed. 2000). The
condition is characterized by a "hypermetabolic state, usually
with weight loss, tremulousness, elevated plasma levels of
thyroxin and/or thiiodothyronine, and sometimes exophthalmos;"
and it "may progress to severe weakness, wasting, hyperpyrexia,
and other manifestations of thyroid storm." <u>Id</u>. Finally, it is
"often associated with exophthalmus (Graves disease)." <u>Id</u>.
Exophthalmus is defined as "protrusion of one or both eyeballs,"

application was denied on initial consideration, (Tr. 57), and she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 56).

A hearing was held before an ALJ on February 27, 2006. (Tr. 336). The ALJ issued a decision on July 28, 2006, denying plaintiff's claim. (Tr. 12-26). The Appeals Council denied plaintiff's request for review on November 28, 2006. (Tr. 5-7). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

Plaintiff was the sole witness at the February 27, 2006 hearing, where she was represented by counsel. She testified that she lived with her husband in a mobile home. Plaintiff had one daughter, who was married, and no grandchildren. (Tr. 338).

Plaintiff testified that she developed hyperthyroidism in March 2004. (Tr. 341). The condition caused night sweats, nosebleeds, and chills, all of which interfered with her sleep. (Tr. 343). After medicine failed to alleviate the symptoms,

---

and endocrine exophthalmos is such protrusion associated with thyroid gland disorders. Id. at 631. Hypothyroidism is defined as "diminished production of thyroid hormone, leading to clinical manifestations of thyroid insufficiency, including low metabolic rate, tendency to weight gain, somnolence [sleepiness], and sometimes myxedema." Id. at 866, 1656. Myxedema is defined as "hypothyroidism characterized by content of mucins. . . in the fluid" and leads to "somnolence, slow mentation, dryness and loss of hair, increased fluid in body cavities . . . subnormal temperatures, hoarseness, muscle weakness, and slow return of a muscle to the neutral position after a tendon jerk." Id. at 1178. Myxedema is "usually caused by removal or loss of thyroid tissue." Id.

plaintiff underwent a thyroidectomy on May 20, 2004. (Tr. 342).
Plaintiff testified that for approximately two weeks following the
surgery, her symptoms improved, but the symptoms later returned to
their pre-surgery state. (Tr. 343-44). Plaintiff reported that at
the time of the hearing, she was experiencing night sweats,
nosebleeds, chills, and "extreme muscle and joint pain." (Tr. 343).
She said she had heart palpitations if she attempted to engage in
strenuous activity. (Tr. 343). Finally, plaintiff stated she spent
most of her day in bed, partly because of physical problems, and
also "being depressed about how . . . my life is now." (Tr. 344).

Plaintiff reported that her thyroid problems caused her to
quit her job at Missouri Home Care, where she was an elder-care
worker, in March 2004. (Tr. 339-40). She testified that prior to
quitting, she occasionally drew unemployment when she did not have
a sufficient number of clients. (Tr. 339, 351).

When the ALJ asked plaintiff about any mental impairments, she
responded that she had been involuntarily hospitalized for
psychiatric problems two times. (Tr. 345-46). Plaintiff said that
both hospitalizations stemmed from her thyroid condition, which
caused emotional and mental problems. (Tr. 346-49).

The first hospitalization was at Barnes Jewish St. Peters
Hospital on March 22, 2004. (Tr. 346). Plaintiff testified that she
went to the hospital to get help with her thyroid, and when she
arrived, "I was crying, very distressed [and] very frustrated
because every physician I had went to couldn't get this under
control." (Tr. 347). Plaintiff testified that a friend who had

accompanied her to the hospital told the emergency room staff that plaintiff "could not make it through this," and the staff interpreted this statement as an indication that plaintiff was suicidal. (Tr. 347). Plaintiff testified at the hearing that she had not been suicidal, she was simply frustrated and distressed. (Tr. 347). She said that a psychiatrist later told her that "Hyperthyroidism mimics manic depressant [sic], but it does not make you so." (Tr. 347).

Plaintiff was hospitalized involuntarily a second time in August 2004 at Phelps County Regional Medical Center. (Tr. 346, 348, 352). Plaintiff stated that doctors told her that her TSH levels were not in an acceptable range.[2] (Tr. 348). She reported telling the doctors that she felt that people were watching her and communicating with her through her teeth. Plaintiff also stated that the caps on her teeth were buzzing or vibrating. (Tr. 352). At the time of the hospitalization, plaintiff had not been eating and had not been taking her medicine because she was "paranoid" and thought the medicine "was rat poison." (Tr. 348-49).

The plaintiff did not testify about muscle damage, which she alleged was one of the conditions, along with thyroid problems, that rendered her disabled. (Tr. 12-26).

_____

[2] TSH is an abbreviation for thyroid stimulating hormone. Medline Plus, United States National Library of Medicine and the National Institutes of Health, *available at* http://www.nlm.nih.gov/medlineplus/druginformation.html (last accessed Feb. 11, 2008). Normal values of TSH are from 0.4 to 4.0 mlU/L for those with no symptoms of abnormal thyroid function, and values of 0.5 to 2.0 mlU/L for those being treated for a thyroid disorder. Id.

When asked about her daily activities, plaintiff reported cooking "something out of a box or something really simply [sic] like a sandwich." (Tr. 353). She said that she usually went grocery shopping only when her husband could accompany her, because "I can't hardly make a decision on my own, and I don't want to go alone." (Tr. 353). Plaintiff said that two or three times a week, she cried intermittently throughout the day, because "I get to feeling sorry for myself and how things are." (Tr. 354). She reported that on a good day, she got up to take her medicine, and then returned to bed until it was time for her husband to go to work and for her to take the next dose of medicine. (Tr. 354). She testified that she would then try to wash a few dishes and clean up the house a little, but she often got tired and went back to bed. (Tr. 354). Plaintiff said that most days she did not get dressed, but spent the day in her pajamas. (Tr. 354).

Plaintiff testified that she did not do any yard work or attend church, but she did laundry, handled household finances, and was able to groom and bathe herself. (Tr. 355). Plaintiff reported that her husband "makes me try to take a walk every day, at least a walk around the yard." (Tr. 354). She said she could stand for about an hour until she had to sit down, and then she could sit for an hour before she had to get up and walk around. (Tr. 356). Plaintiff stated that she could walk for about fifteen to twenty minutes and could lift twenty pounds. (Tr. 356).

III.     **Medical Evidence**

A.   Medical Evidence in the Record

5

On January 30, 2004, plaintiff visited C.W. Cunningham, M.D., her family physician, complaining of fatigue and night sweats. (Tr. 311). On February 12, 2004, she called Dr. Cunningham's office claiming she had no energy, no appetite, was not sleeping, and was having cold and hot flashes. (Tr. 311). On February 23, 2004, plaintiff requested a referral to a specialist and requested anxiety medication. (Tr. 310). Dr. Cunningham prescribed Xanax and referred plaintiff to Judyann Krenning, M.D., an endocrinologist.[3] (Tr. 310).

Dr. Krenning examined plaintiff on March 1, 2004, and diagnosed her with Hashimoto's thyroiditis.[4] (Tr. 192). Dr. Krenning explained three treatment options to plaintiff: treatment with medication, radioactive I131 treatment, and surgery. (Tr. 193). Dr. Krenning stated that she preferred to start with medicinal treatment and told plaintiff to return for a visit in six to eight weeks. (Tr. 193).

---

[3] Xanax is a trade name for Alprazolam, which is a benzodiazepine medication used to treat anxiety disorders, panic attacks, and depression, agoraphobia (fear of open spaces), and premenstrual syndrome. MedLine, *supra* n 2. Endocrinology is a medical specialty concerned with "the internal or hormone secretions and their physiologic and pathologic reactions." PDR. Med. Dict. at 592.

[4] Hashimoto's thyroiditis is defined as "inflammation of the thyroid gland or diffuse infiltration of the thyroid gland with lymphocytes, resulting in diffuse goiter, progressive destruction of the parenchyma and hypothyroidism." PDR. Med. Dict. at 1834. Hashimoto's thyroiditis is synonymous with autoimmune thyroiditis. Id. A goiter is "chronic enlargement of the thyroid gland." Id. at 761. Parenchyma are the distinguishing or specific cells of a gland or organ. Id. at 1316.

On March 22, 2004, plaintiff arrived at the emergency room at Barnes Jewish St. Peters Hospital claiming to be depressed and anxious. (Tr. 322). She reported that she had been diagnosed with thyroid disorder, and she expressed extreme frustration with her thyroid condition, her primary care physician, and the side effects of her medications. (Tr. 315-25). Plaintiff expressed to emergency room staff "enough frustration that she could possibly harm herself" and told staff "that she did not try any suicidal or homicidal plans or actions." (Tr. 323). Hospital medical staff ordered an evaluation of her general medical condition and her thyroid condition, as well as a psychiatric evaluation. (Tr. 323). Plaintiff was admitted to the hospital for observation under suicide precautions. (Tr. 323).

In the emergency room, plaintiff reported that she had been treated with the medications Tapazole, Propranolol, and PTU and that she was then taking Methimazole.[5] (Tr. 323). Emergency room doctors prescribed multivitamins, Protonix, and Ativan.[6] After plaintiff was admitted, Jerome Thurman, M.D., an endocrinologist,

---

[5] Tapazole is a trade name for Methimazole, a medication used to treat hyperthyroidism. MedLine, *supra* n 2. Propranolol is used to treat high blood pressure, abnormal heart rhythms, migraines and tremors, and to prevent angina and heart attacks. Id. PTU is an abbreviation for Propylthiouracil, which is used to treat hyperthyroidism. Id.

[6] Protonix is a compound that inhibits gastric acid secretion and is used to treat gastroesophageal reflux disease and to treat conditions where the stomach produces too much acid. Id.; Physicians Desk Reference 3411 (62d ed. 2008). Ativan is a trade name for Lorazepam, which is used to relieve anxiety. MedLine, *supra* n 2.

determined that plaintiff was allergic to Tapazole and prescribed Lopressor and PTU.[7] (Tr. 323).

Seth Tilzer, M.D. performed a consultative examination of plaintiff at Barnes Jewish St. Peters Hospital. (Tr. 332-33). He found that she was experiencing a manic episode precipitated by hyperthyroidism or a hypomanic condition. (Tr. 333). Dr. Tilzer indicated that plaintiff's global assessment of functioning (GAF) score was 40.[8] (Tr. 333).

Plaintiff called Dr. Cunningham's office on March 24, 2004, to report that she had been involuntarily hospitalized and to request a different treatment plan with quick results. (Tr. 310). On April 4, 2004, plaintiff visited Dr. Krenning again. (Tr. 193). Dr. Krenning observed that plaintiff was allergic to iodine, which made the radioactive I131 treatment impossible, and that she was experiencing side effects from her prescription medicine. (Tr. 193). Dr. Krenning recommended surgery, and plaintiff had a total thyroidectomy on May 20, 2004. (Tr. 193-94, 262-68). In follow-up visits on May 27 and July 6, 2004, Dr. Krenning determined that

---

[7] Lopressor is a trade name for Metoprolol, which is used to treat high blood pressure and heart attacks and to prevent angina. Id.

[8] A Global Assessment Functioning score is a score on a 0-100 rating scale of psychological functioning. Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision (American Psychiatric Association, 2000) (hereinafter DSM-IV-TR), 34. A GAF score in the 31-40 range indicates "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . . .)." DSM-IV-TR at 34.

plaintiff's recovery was satisfactory, but she noted on July 6 that plaintiff "could not tolerate the medications . . . is still feeling a little nervous [and] has had a few bad days." (Tr. 194-95). Dr. Krenning prescribed Synthroid, Rocaltrol, and Xanax.[9] (Tr. 194-95).

The Disability Determination office ordered a physical examination of plaintiff after she applied for benefits, and on June 14, 2004, John Demorlis, M.D., reported his findings. (Tr. 292-95). Dr. Demorlis noted that plaintiff had been diagnosed with hyperthyroidism, that she'd undergone a thyroidectomy, and that she was on thyroid replacement therapy. (Tr. 292). Dr. Demorlis wrote that plaintiff denied having back pain; according to Dr. Demorlis, plaintiff reported that she had no trouble walking or sitting, that she could stand for between 10 minutes and 2 hours, and that she could carry and lift about 40 pounds. (Tr. 292).

Dr. Demorlis noted that plaintiff said "that her moods change, she becomes sleepy and then is hyperactive. She has had muscle aches and sweating spells in the past. She ended up at Barnes-St. Peters emergency room and they put her in a psychiatric room until a psychiatrist and endocrinologist saw her. They let her go. The

---

[9] Synthroid is a medication that contains a synthetic compound identical to that produced in the human thyroid gland. Physicians Desk Reference at 494. Rocaltrol is a synthetic vitamin D analog that promotes absorption of calcium from the gastrointestinal tract and its utilization in the body. It is used by dialysis patients and hypoparathyroidism patients. Id. at 2744. Hypoparathyroidism is defined as "a condition due to diminuition or absence of the secretion of the parathyroid hormones." PDR Med. Dict. at 862.

patient believes that it was all due to her thyroid disease." (Tr. 292). Dr. Demorlis observed "rapid fire speech" and noted that plaintiff "moves around the room quite easily and rapidly," was "preoccupied" about her hospitalization at St. Peters, and was "upset at some of the doctors' treatments both there and locally." (Tr. 294). As one of his clinical impressions, Dr. Demorlis wrote: "Personality disorder?". (Tr. 295).

On July 7, 2004, Mark Stevens, Psy.D., LPC, and Karen MacDonald, Psy.D., reported the results of a psychiatric examination ordered by the Disability Determinations office. (Tr. 288-91). They noted that the "primary problems" presented by plaintiff "appear to be ones associated with Mood Disorder as a result of hyperthyroidism," including "significant depressive symptomatology" resulting from that condition. (Tr. 288).

Drs. Stevens and MacDonald determined that plaintiff was "oriented to time, place, person, and purpose" and "denied experiencing hallucinations and/or delusions;" overall, her "quality of thinking" was "in the adequate range of functioning." (Tr. 290). Plaintiff appeared "capable of understanding and following instructions," and "[p]redictable behaviors appear present in social situations." (Tr. 290). The psychiatrists found, however, that plaintiff lacked "appropriate coping skills at this time" to "tolerate] external stressors," which "tend to exacerbate depressive symptomatology." (Tr. 290).

Drs. Stevens and MacDonald found that plaintiff had a mood disorder due to hyperthyroidism and found her GAF score to be 55, indicating serious symptoms.[10] (Tr. 291).

Paul Stuve, Ph.D., evaluated plaintiff's condition at the request of the Office of Disability Determinations. (Tr. 108-114). On July 29, 2004, Dr. Stuve reported that plaintiff had severe impairments that were not expected to last 12 months. (Tr. 108). Dr. Stuve found that plaintiff suffered from "depression and stress related to her physical condition" and could not "withstand the pressures of the workplace at present." (Tr. 114). Dr. Stuve noted, however, that with "ongoing treatment, [plaintiff's] depression is expected to improve over the next several months," and he concluded that "her mental impairment will be nonsevere" by March 2005. (Tr. 114).

Family members brought plaintiff to the emergency room at Phelps County Regional Medical Center on August 25, 2004. (Tr. 251). They reported that plaintiff was "delusional and angry, paranoid, suspicious, and agitated . . . unable to think clearly and was confused." (Tr. 251). Shirley Eyman, M.D., interviewed plaintiff and reported she was uncooperative and angry, a "poor historian" of her own mental and psychiatric history, and was

---

[10] A GAF score in the 51-60 range indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

"unable to answer most questions." (Tr. 253-54). Plaintiff declined a physical examination. (Tr. 254).

Dr. Eyman wrote, "According to other historical information obtained," plaintiff had a "recent psychotic episode when she was hyperthyroid. . . . She did better after the thyroidectomy but then apparently has not been taking the Synthroid that she was supposed to be taking." (Tr. 253). Plaintiff's family members did not believe she had been taking the Synthroid. (Tr. 253).

Dr. Eyman noted that since her thyroidectomy, plaintiff "has gradually become increasingly confused, irrational, and paranoid." (Tr. 253). Plaintiff's family members reported that plaintiff "thinks people are watching her and believes that people are telling her things through her teeth, that her water is contaminated and she has been afraid to eat or drink." (Tr. 253). Plaintiff had also "held a gun to her daughter and busted the headlights out of the husband's truck." (Tr. 253). Dr. Eyman found that plaintiff's GAF score was 30.[11] (Tr. 254).

In addition to restarting plaintiff's prescription to Synthroid, Dr. Eyman also prescribed Zyprexa for psychotic symptoms.[12] (Tr. 251). These medications resolved plaintiff's

_____

[11] A GAF score in the 21-30 range indicates, "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly inappropriately, suicidal preoccupations), OR inability to function in almost all areas (e.g. stays in bed all day, no job, home, or friends)." DSM-IV-TR at 34.

[12] Zyprexa is a psychotropic medication used to treat schizophrenia and bipolar disorder, or agitation associated with either. Physicians Desk Reference at 1866-68.

psychosis, but then plaintiff "was very depressed," so Dr. Eyman prescribed Zoloft, increased the dosage of her Zyprexa prescription, and prescribed Trazadone to help plaintiff sleep.[13] (Tr. 251). Dr. Eyman also referred plaintiff to individual and group psychotherapy. (Tr. 254). By September 2, 2004, plaintiff's condition had improved greatly, and she was discharged. (Tr. 254).

Plaintiff began attending regular sessions at Pathways Community Behavior Healthcare, Inc. in the fall of 2004. (Tr. 137-88, 217-35). Fauzia Iqbal, M.D., a psychiatrist, met with plaintiff regularly during 2004 and 2005. (Tr. 217-35). Plaintiff also met regularly with Community Support Specialists at Pathways. (Tr. 137-88).

In her first assessment, on October 11, 200,Dr. Iqbal noted that plaintiff suffered from fatigue, exhibited symptoms of perfectionism, and had experienced depressive episodes and psychotic episodes. (Tr. 218-19). Plaintiff told Dr. Iqbal that she had been physically abused as a child and felt that this still affected her. (Tr. 219). Dr. Iqbal found that plaintiff's GAF score was 40.[14] (Tr. 223). Though Dr. Iqbal deferred a diagnosis of any

---

[13] Zoloft is a selective serotonin uptake inhibitor that is used to treat major depressive disorder, obsessive compulsive disorder, panic disorder, post traumatic stress disorder, premenstrual dysphoric disorder, and anxiety disorder. Physicians Desk Reference at 2576-78. Trazodone is a serotinon modulator that is used to treat depression, schizophrenia, anxiety, and alcohol abuse. MedLine, *supra* n 2.

[14] Dr. Iqbal's handwritten notes indicate a GAF score of 40, but the typed notes dated the same day indicate a higher score of 45. A GAF score in the 31-40 range indicates "Some impairment in reality testing or communication (e.g., speech is at times

clinical or personality disorder, she noted that the focus of clinical attention should be Psychotic Disorder-Not Otherwise Specified and recurrent episodes of Major Depressive Disorder of moderate severity.[15] (Tr. 224-25).

On plaintiff's next visit, November 3, 2004, Dr. Iqbal noted that plaintiff had stopped taking Zyprexa and Trazodone, but was still taking Zoloft.(Tr. 227). Dr. Iqbal also prescribed Abilify for mood stabilization.[16] (Tr. 227). At plaintiff's next visit, on December 1, Dr. Iqbal noted plaintiff was preoccupied with health

---

illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .)." DSM-IV-TR at 34. A GAF score in the 41-50 range indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." Id.

[15] Psychotic disorder-not otherwise specified indicates that a patient is displaying "psychotic symptamotology (i.e. delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior) about which there is inadequate information to make a specific diagnosis or about which there is contradictory information, or disorders with psychotic symptoms that do not meet the criteria for any specific Psychotic Disorder." DSM-IV-TR at 343. Recurrent major depressive disorder is characterized by more than one period of at least two weeks, two months or more apart, in which "there is either depressed mood or the loss of interest or pleasure in nearly all activities." Id. at 349. The patient must also experience "at least four additional symptoms drawn from a list that includes changes in appetite or weight, sleep, and psychomotor activity; decreased energy; feelings of worthlessness or guilt; difficulty thinking, concentrating, or making decisions; or recurrent thoughts of death or suicidal ideation, plans, or attempts." Id.

[16] Abilify is a psychotropic medication used to treat schizophrenia, bipolar disorder, or agitation associated with either. Physicians Desk Reference at 872-74.

issues, complained of weight gain, had interrupted eye contact, and euthymic excessive speech. (Tr. 228).

Plaintiff visited Dr. Krenning on January 5, 2005 claiming to have pain at the site of the surgical incision in her neck: Dr. Krenning suspected a stitch abcess, and removed it on January 31. (Tr. 197-98).

On January 12, 2005, Dr. Iqbal noted that plaintiff had "ideas of amotivation, lassitude, anhedonia, concerned about persistent [weight] gain, euthymic restricted range of affect."[17] (Tr. 229). Dr. Iqbal decided to reduce plaintiff's dosage of Zoloft gradually and prescribed Wellbutrin in a gradually increasing dosage.[18] (Tr. 229). On February 23, 2005, plaintiff missed an appointment with Dr. Iqbal. (Tr. 230). The following day, plaintiff appeared for a scheduled appointment with a Community Support Specialist, who noted that plaintiff apologized for missing the previous day's appointment and said she had forgotten what day of the week it was. (Tr. 146).

On April 6, 2005, Dr. Iqbal noted that plaintiff denied being depressed, but plaintiff avoided eye contact with her, expressed "intense frustration" with and resentment of Dr. Iqbal, and was preoccupied with medical issues. (Tr. 231). Plaintiff's speech appeared "mildly rapid, with push," and her "thought content is

---

[17] Anhedonia is defined as "lack of pleasure in acts which are normally pleasurable" and may be an early sign of schizophrenia. Taber's Medical Cyclopedia 86 (14th ed. 1981). Lassitude is weariness or exhaustion. Id. at 799.

[18] Wellbutrin is an antidepressant used to treat major depressive disorder. Physicians Desk Reference at 1611-13.

cynical." (Tr. 231). On June 1, Dr. Iqbal observed that plaintiff avoided eye contact, had "non-spontaneous increase latency of response, brief responses with frequent pauses," and "perceives rejection on her physician's part." (Tr. 232). Plaintiff was also "[d]ysphoric tearful with constricted range."[19] (Tr. 232). Dr. Iqbal determined that plaintiff was experiencing a recurrence of a depressive episode. (Tr. 232).

Plaintiff visited Dr. Krenning in July 2005, and Dr. Krenning noted that plaintiff was having continuing problems with hypothyroidism and her medication. (Tr. 200-201).

On August 23, 2005, Dr. Iqbal found plaintiff preoccupied with family and personal issues, "dysphoric, restricted range of affect, verbose at times rather animated, anxious, anhedonic, amotivation," and claiming fatigue. (Tr. 233). On September 20, 2005, after a discussion with plaintiff's Community Services Specialist, Dr. Iqbal determined that plaintiff's behaviors indicated "MDDR" or recurrent Major Depressive episodes, GAD or Generalized Anxiety Disorder, and Personality Disorder-Not Otherwise Specified.[20] (Tr.

---

[19] Dysphoria is defined as "exaggerated feeling of depression and unrest without apparent cause." Taber's Medical Cyclopedia at 442.

[20] Generalized Anxiety Disorder is "characterized by at least 6 months of persistent and excessive anxiety and worry" accompanied by "at least three additional symptoms from a list that includes restlessness, being easily fatigued, difficulty concentrating, irritability, muscle tension, and disturbed sleep." DSM-IV-TR at 429, 472. Personality Disorder-Not Otherwise Specified is "a category provided for two situations: (1) the individual's personality pattern meets the general criteria for a personality disorder and traits of several different personality disorders are present, but the criteria for any specific personality disorder are not met; or (2) the

234). On November 20, 2005, the last appointment with Dr. Iqbal for which there is a record, Dr. Iqbal noted plaintiff was angry and frustrated and expressed negative thoughts about physical health care she had received so far, yet was "not willing to accept any suggestions" by Dr. Iqbal to "help improve her negativity." (Tr. 235).

Plaintiff began treatment with Daniel Lyons, M.D., in August 2005 and had regular appointments with him until December 2005. (Tr. 237-250). Dr. Lyons determined that Hashimoto's disease was unlikely, but speculated that residual thyroid tissue remained after plaintiff's thyroidectomy, and the tissue might be producing excessive amounts of thyroid hormones. (Tr. 241). Dr. Lyons ordered more testing, and then determined that plaintiff's diagnosis was "[p]robably Hashitoxicosis." (Tr. 245). On October 14, 2005, he wrote: "By piecing the history together, I believe patient probably

---

individual's personality pattern meets the general criteria for a personality disorder, but the individual is considered to have a personality disorder that is not included in the classification (i.e. passive-aggressive personality disorder)." DSM-IV-TR at 685. General diagnostic criteria for personality disorder include "An enduring pattern of . . . experience and behavior that deviates markedly from the expectations of the individual's culture," as manifested in two or more of the following categories: "(1) cognition (i.e. ways of perceiving and interpreting self, other people, and events), (2) affectivity (i.e. the range, intensity, lability, and appropriateness of emotional response), (3) interpersonal functioning, and (4) impulse control." Id. at 689. The enduring pattern is "inflexible and pervasive," and "leads to clinically significant distress or impairment in social, occupational, or other important areas of functioning." Id. The pattern is "stable and of long duration," and is neither "better accounted for as manifestation or consequence of another mental disorder" nor "due to direct physiological effects of a substance or a general medical condition." Id.

had autoimmune thyroid disease . . . with probable Graves disease. Because of intolerance to medications, underwent thyroidectomy . . . Subsequently placed on thyroid hormone but presumably dose too high. Was taken off and now where we are currently – no uptake due to combination of no tissue and possible autoimmune destruction."[21] (Tr. 245). On November 11, 2005, Dr. Lyons reported, plaintiff's TSH level was 20.94, so he planned to increase her dosage of Synthroid. (Tr. 250).

Plaintiff visited Dr. Krenning in January 2006, and Dr. Krenning noted that plaintiff was having continuing problems with hypothyroidism and her medication. (Tr. 200-201).

Dr. Iqbal completed a Function Report for Disability Determinations on February 21, 2006. (Tr. 83-4). Dr. Iqbal found that plaintiff had poor or no ability to relate to coworkers, to deal with the public, to interact with supervisors, to deal with work stresses, to maintain attention or concentration, to understand, remember and carry out complex job instructions, to maintain personal appearance, to behave in an emotionally stable manner, or to relate predictably in social situations. (Tr. 83-4). Dr. Iqbal found plaintiff had fair ability to use judgment and function independently; to understand, remember and carry out

---

[21] Graves disease is defined as: "(1) toxic goiter characterized by diffuse hyperplasia of the thyroid gland, a form of hyperthyroidism; (2) thyroid disfunction and all or any of its clinical associations; (3) an organ specific autoimmune disease of the thyroid gland." PDR Med. Dict. at 515. Hyperplasia is an increase in the number of normal cells in a tissue or organ, excluding tumor formation, whereby the bulk of the part or organ may be increased. Id. at 853.

simple and detailed, but not complex, job instructions; and to demonstrate reliability. (Tr. 82-3). She found plaintiff had good ability to follow work rules. (Tr. 83). Dr. Iqbal further noted that plaintiff tended to lose her train of thought; had poor memory, concentration, and thought organization; and had poor hygiene and grooming. (Tr. 83). Finally, Dr. Iqbal indicated that plaintiff experienced impulsive anger and severe agitation. (Tr. 83). Dr. Iqbal diagnosed plaintiff with bipolar disorder and thyroid dysfunction.[22] (Tr. 84).

B. <u>Other Medical Evidence in the Record</u>

The record contains information about medical treatment plaintiff sought for conditions that did not form the basis of her application for disability benefits. For example, plaintiff underwent testing to determine whether she had sleep apnea (she did not); and once visited a hospital with neck and arm pain. (Tr. 286-87, 279). Because these conditions did not form the basis for the ALJ's decision, the Court does not discuss them herein.

IV. **<u>ALJ's Decision</u>**

---

[22] There are two types of bipolar disorder, and Dr. Iqbal did not specify with which condition she diagnosed plaintiff. Both Bipolar Disorder I and Bipolar Disorder II are distinguished from Major Depressive Disorder by the presence of one or more manic episodes or mixed episodes (a period of time in which an individual displays symptoms of both major depressive disorder and a manic episode). <u>DSM-IV-TR</u> at 362, 382, 387. The absence of manic or mixed episodes is one of the diagnostic criteria for Major Depressive Disorder, unless a manic, mixed, or hypomanic episode occurred and was substance induced, or was due to medical treatment or to a general medical condition. <u>Id</u>. at 376.

Administrative Law Judge J. Pappenfus presided at plaintiff's administrative hearing. The ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset date of disability.

3. The claimant has mild limitations in her activities of daily living attributable to her mental impairment. She has mild limitation in social functioning. She has moderate limitations in concentration, persistence, or pace. She has experienced one relevant episode of deterioration or decompensation. A residual disease process has <u>not</u> resulted in such marginal adjustment that even a minimal increase in mental demands or change in her environment would cause her to decompensate. She is able to function outside of a highly supportive living arrangement. She can function independently outside the area of her home.

4. The claimant's major depressive disorder or bipolar affective disorder, hypothyroid condition after a thyroidectomy and right side carpal tunnel syndrome are 'severe' impairments based on the requirements in the Regulations 20 C.F.R. §§ 1520(c), 416.920(c).

5. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

6. The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

7. I find that the claimant retains the residual functional capacity to perform a wide range of light exertional work, specifically, unskilled light work. Light exertional work requires a maximum lifting of 20 pounds; a frequent lifting of 10 pounds; and, sitting/standing/walking for 6 out of 8 hours. She can understand, carry out and remember simple instructions, her use of judgment is appropriate, she would respond appropriately to supervision, co-workers, working with the public and usual work situations, and she would deal appropriately with those changes and increased mental

20

demands that are associated with a routine competitive work setting. She is capable of performing unskilled work at the light exertional level.

8.    The claimant is unable to perform any of her past relevant work (20 C.F.R. §§ 404.1565, 416.965).

9.    The claimant is a "younger individual between the ages of 18 and 44" (20 C.F.R. §§ 404.1563, 416.963).

10.   The claimant has a "high school (or high school equivalent) education" (20 C.F.R. §§ 404.1564, 416.964).

11.   The transferability of skills is not an issue in this case because she is limited to unskilled work (20 C.F.R. §§ 404.1568, 416.968).

12.   The claimant has the residual functional capacity to perform substantially all of the full range of light work (20 C.F.R. §§ 404.1567, 416.967).

13.   Based on an exertional capacity for light work, and the claimant's age, education, and work experience, Medical-Vocational Rule 202.21, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

14.   The claimant's capacity for light work is substantially intact and has not been compromised by any nonexertional limitations. Accordingly, using the above-cited rules as a framework for decision-making, the claimant is not disabled.

15.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. §§ 404.1520(g), 416.920(g)).

(Tr. 25-26).

## V.    Discussion

To be eligible for Disability Insurance benefits, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental

impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2006). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B) (2006).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." <u>Nimick v. Secretary of Health and Human Serv.</u>, 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, she is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, she is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, she is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform her past relevant work. If the claimant can, she is not disabled. Fifth, if the claimant cannot perform her past relevant work, the ALJ determines whether she is capable of

performing any other work in the national economy. If the claimant is not, she is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (2002); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).

A.   <u>Standard of Review</u>

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." <u>Long v. Chater</u>, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002) (quoting <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001)). The Court may not reverse merely because the evidence could support a contrary outcome. <u>Estes</u>, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.   The ALJ's credibility findings;

2.   the plaintiff's vocational factors;

3.   the medical evidence;

4.   the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.   third-party corroboration of the plaintiff's impairments; and

6.   when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See <u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)).

B.    <u>Plaintiff's Allegations of Error</u>

Plaintiff raises two issues before the Court: (1) she claims the ALJ erred by failing to treat plaintiff's emotional and endocrinological problems as non-exertional impairments, and (2) there was insufficient evidence in the record to allow the ALJ to disregard or discount the opinions of psychiatrists Dr. Iqbal and Dr. MacDonald.

1.    <u>Non-exertional impairments</u>

Plaintiff argues that the ALJ erred in failing to treat the plaintiff's emotional and endocrinological problems as non-exertional impairments.[23] Defendant responds that the ALJ carefully considered the entirety of the medical evidence in the record and

---

[23] Non-exertional impairments are limitations or restrictions which affect a claimant's ability "to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling." 20 C.F.R. § 404.1569a(a).

properly found that plaintiff could perform light unskilled work, despite her impairments.

The Court notes that the ALJ, contrary to plaintiff's assertion, did not fail to treat plaintiff's physical and mental impairments as non-exertional impairments. The ALJ found that plaintiff's medical and psychological conditions were severe impairments. (Tr. 25). The ALJ then applied Rule 202.21, Table No. 2, Appendix 1, Subpart P of Regulation No. 4 (see 20 C.F.R. Pt. 404, Subpt. P, App. 2). The ALJ considered both plaintiff's physical ability and her ability to perform non-strength related job duties. (Tr. 23). The ALJ found, for example, that plaintiff could understand, remember, and carry out simple instructions, and could respond appropriately to supervisors, co-workers, and the public. (Tr. 23). After considering the evidence, the ALJ determined that plaintiff could perform both the strength-related and non-strength demands of jobs in the light work category. The Court finds no legal error in the ALJ's procedures, and finds that the determination is supported by substantial evidence in the record.

## 2. Weight Given to Physicians' Opinions

Plaintiff argues that the ALJ improperly disregarded the opinions of Dr. Iqbal (plaintiff's treating psychiatrist) and Dr. MacDonald (who performed a clinical psychological evaluation of plaintiff at the request of Disability Determinations). Plaintiff asserts that the opinions of Drs. Iqbal and MacDonald are contrary to the findings of the ALJ. Plaintiff cites to portions of the

record where Dr. Iqbal indicated that plaintiff's abilities in several work areas were extremely limited, and where Dr. MacDonald found that plaintiff's mood symptoms and poor ability to cope with stress would be exacerbated if she returned to work. (Tr. 83-4, 290-91).

In response, defendant argues that the ALJ discounted Dr. Iqbal's opinion because it was inconsistent with the weight of medical evidence in the record, which shows that plaintiff, despite her limitations, is capable of performing light unskilled work.

Dr. Iqbal was plaintiff's treating psychiatrist, while Dr. MacDonald was a consulting psychiatrist; thus, their opinions are not entitled to be given the same weight:

> A treating physician's opinion should not ordinarily be disregarded and is entit
led to substantial weight. . . . In fact, it should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. . . . By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."

Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citations omitted). This rule applies to opinions of treating psychiatrists and treating psychologists. See 20 CFR § 404.1527(a)(2) (referring to physicians, psychologists, and other treating sources).

"Whether the ALJ grants a treating physician's opinion substantial or little weight . . . the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluations." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000), citing 20 C.F.R. § 404.1527(d)(2). The ALJ's function is "to

resolve conflicts among 'the various treating and examining physicians.'" Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1994) (citations omitted). "While the opinions of treating physicians are entitled to special weight, they do not automatically control, since the record must be evaluated as a whole." Id.

An ALJ's "decision to discount or even disregard the opinion of a treating physician" has been upheld "where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000), citing Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000), and Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996). Additionally, it is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence in the record. Prosch, 201 F.3d at 1013.

The ALJ gave several reasons for not giving controlling weight to Dr. Iqbal's finding that plaintiff was disabled by her impairments. First, the ALJ found that Dr. Iqbal relied heavily on plaintiff's subjective complaints of her condition, but plaintiff's subjective complaints were not consistent with the observations of the medical professionals treating her. Further, the ALJ observed that Dr. Iqbal's assessment was not consistent with her own treatment notes during sessions with plaintiff.

The ALJ also pointed to evidence in the record inconsistent with Dr. Iqbal's assessment, noting that plaintiff regularly drove herself to appointments, arrived punctually, and was appropriately

dressed and well-groomed. (Tr. 22). The ALJ also found that plaintiff responded appropriately to family emergencies, and when she missed appointments, she chose to do so because "something else came up." (Tr. 22). A review of the notes taken by Dr. Iqbal and Community Services Support workers at Pathways supports the ALJ's observations. (Tr. 136-88, 217-35).

Defendant points to other evidence in the record that supports the ALJ's discounting of Dr. Iqbal's opinion. Defendant considers plaintiff's admissions that she could follow clear and precise instructions and did not have problems getting along with others. (Tr. 103, Def. Brief at 24). Defendant also notes that Drs. Stevens and MacDonald found that plaintiff was capable of understanding and following instructions and had adequate pace and persistence, though she might experience increased mood symptoms if she returned to work. (Tr. 290-91, Def. Brief at 24). Defendant correctly notes that the GAF score of 55 that they assigned to plaintiff is consistent with GAF scores of other claimants who were found capable of doing light unskilled work. See, e.g., Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005).

Finally, the ALJ found that plaintiff reported that her symptoms improved with treatment, but she at times failed to take her medication and refused a prescription medication and a medication adjustment. (Tr. 20). The ALJ also observed that plaintiff missed psychiatric appointments and did not take her psychiatrist's advice to engage in more activities and keep a journal. (Tr. 21). Failure to "follow prescribed medical treatment

without good cause" is a basis for denying benefits. <u>Kelley v. Barnhart</u>, 372 F.3d 958, 961 (8th Cir. 2004) (citation omitted). Such failure also may undermine a claimant's credibility. <u>O'Donnell v. Barnhart</u>, 318 F.3d 811, 819 (8th Cir. 2003). Further, the regulations provide that if a claimant does not follow prescribed treatment "without a good reason, we will not find you disabled." 20 C.F.R. § 404.1530.

The Court finds that it was within the ALJ's discretion to resolve the conflicting assessments of plaintiff's medical and mental conditions, and will not disturb the ALJ's decision that Dr. Iqbal's opinion was inconsistent with other evidence in the record.

3.  <u>Credibility Determination</u>

An ALJ's credibility determination is "entitled to considerable deference." <u>Dilling Mech. Contractors, Inc. v. Nat'l Labor Relations Bd.</u>, 107 F.3d 521, 524 (7th Cir. 1997) (citations omitted), <u>cert. denied</u>, 522 U.S. 862 (1997). "Great weight is afforded the credibility determination of the ALJ, as he or she had the opportunity to observe the witnesses testify." <u>Nat'l Labor Relations Bd. v. Horizons Hotel Corp.</u>, 49 F.3d 795, 799 (1st Cir. 1995), <u>supplemented by</u> <u>In re: Horizons Hotel Corp.</u>, 320 NLRB 1113 (N.L.R.B. Mar. 29, 1996), <u>rev. denied and enforced</u>, <u>Horizons Hotel v. N.L.R.B.</u>, 114 F.3d 1169 (1st Cir. 1997). The Court finds that, in her assessment of plaintiff's credibility and alleged disability, the ALJ considered the correct factors, as set forth in 20 C.F.R. § 404.1529 (2006), 20 C.F.R. § 404.929 (2006), and <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984).

4.   <u>Disability Determination</u>

The vocational factors the Court considers are listed in 20 C.F.R. § 404, Subpart P, App. 2 (2006). Vocational factors include age, education, and work experience, which the Court analyzes in combination with the individual's residual functional capacity. <u>Id.</u>

The plaintiff was forty-four years old at the time of the hearing, with a high school education and training as a certified nurse's assistant. (Tr. 23). She had worked as a home health aide, certified nurse's aide, and clothing factory worker. (Tr. 23). The ALJ found that plaintiff had the residual functional capacity to lift 20 pounds maximum, and to lift 10 pounds frequently, and to sit, stand, and walk for six out of eight hours. (Tr. 23). This level of residual functional capacity qualified plaintiff to perform light exertional work. The ALJ then found that plaintiff could not perform her past relevant work, because each job required exertion beyond the light exertional level. (Tr. 23).

The ALJ next noted that because plaintiff could not perform her past relevant work, the burden shifted to the Commissioner to show that there was other work in the national economy which plaintiff could perform. (Tr. 24). The ALJ determined that plaintiff's capacity for light work was "substantially intact" and had not "been compromised by any nonexertional limitations." (Tr. 26). This determination directed a finding that plaintiff is not disabled. (Tr. 26).

An ALJ "may exclusively rely on the guidelines" without testimony from a vocational expert "even though there are nonexertional impairments if the ALJ finds, and the record supports the finding, that the nonexertional impairments do not *significantly* diminish the claimant's RFC to perform the full range of activities listed in the guidelines." Draper v. Barnhart, 425 F.3d 1127, 1132 (8th Cir. 2005), citing Reed v. Sullivan, 988 F.2d 812, 816 (8th Cir. 1993).

The record supports the ALJ's finding that nonexertional impairments do not significantly diminish her capacity to perform light work.

## V.   Conclusion

The Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her complaint and her brief in support of the complaint is **denied.**

A separate judgment in accordance with this order will be entered this same date.


CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE


Dated this 5th day of March, 2008.